**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **THEODORE E. STROBACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 CV 50012** |
| **v.** | ) | |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN,** | ) | **Magistrate Judge** |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The Claimant, Theodore Strobach (hereinafter, "Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. Dkt. #8, 16.

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge ("ALJ") made a critical error of fact in regard to the Claimant's past relevant work and erred in determining the Claimant's residual functional capacity ("RFC") by improperly "playing doctor" and rejecting the Claimant's treater's opinion. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth below, the Claimant's motion for summary judgment (Dkt. #8) is granted in part and denied in part, and the Commissioner's motion is denied. The ALJ's decision is reversed, and

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

this matter is remanded to the SSA for further proceedings consistent with this Memorandum Opinion and Order. On the present record, the Court declines to remand with an order to award benefits.

## I. ADMINISTRATIVE DECISION

The Claimant filed an application for DIB on August 17, 2009, alleging disability since May 30, 2000. R. 26. He was denied through every administrative step, including at his administrative hearing, where the Claimant was represented by counsel. R. 26. At the hearing, the Claimant and Susan A. Entenberg, a vocational expert ("VE") testified. R. 50. The ALJ did not have a medical expert testify at the hearing. The Claimant's wife, Sandra Strobach, offered to testify regarding the onset and severity of the Claimant's respiratory issues before the expiration of the insured period. R. 60. However, the ALJ and the Claimant agreed to submit her testimony in a written statement because written testimony would be more efficient. R. 64, 195-96.

The Claimant was born on April 17, 1944, making him 66 years old at the time of the administrative hearing on February 24, 2011 and 61 years old as of the date last insured. R. 53-54. Thus, the Claimant was an "individual closely approaching retirement age". R. 54; *See* 20 C.F.R. § 404, Subpt. P, App. 2 § 202.00(f) (individuals aged 60 to 64 are in the "closely approaching retirement age" category for purposes of determining the transferability of skills).

The VE testified that the Claimant's past relevant work was more as a car driver, rather than an inspector as suggested by the ALJ. R. 65. She explained that a car driver was "light and essentially at the low end of semiskilled and SVP: 3 due to the limited paperwork involved." R. 65. She also testified that his past work did not correspond with any specific DOT title. R.65. The ALJ asked if there were different levels for "inspector" jobs in the DOT. R. 65. The VE

confirmed that there were many DOT titles for inspector, including sedentary jobs, but that the Claimant obtained no transferable skills to sedentary work, and he could not use his skills as a driver in other light jobs. R. 65-66. The ALJ provided no hypotheticals to the VE.

After the hearing, the ALJ issued a decision denying benefits. The ALJ determined that the Claimant had the RFC to perform the full range of light work as defined in 20 CFR § 404.1567(b). R. 29. In determining the RFC, the ALJ afforded "little weight" to the opinion of the Claimant's primary healthcare provider, Nurse Practitioner Michelle Brady. R. 32. The ALJ rejected Ms. Brady's opinion because 1) she was a nurse practitioner, thus not an acceptable medical source, 2) her opinions were inconsistent with the substantial medical evidence that the Claimant's *current* conditions were stable, his sleep improved, and he had not been hospitalized, and 3) her opinions were inconsistent with the substantial medical evidence that the Claimant's conditions *as of his date last insured* were not disabling, including that he had very few respiratory complaints during the time insured. R. 33.

Next, the ALJ found that the Claimant could perform his past relevant work as a "car driver and inspector". R. 33. Critically, the ALJ explained that the Claimant moved 20 cars *per day*, and walked about 250 feet, but sometimes further, each time he moved a car, for a total of about 4 hours of walking per day. R. 33. But the undisputed evidence is that the Claimant moved 20 cars *per hour*. R. 54-56. The ALJ also noted that the Claimant's former employer reported that the Claimant walked approximately 400 feet each time he moved a vehicle. R. 33. Consequently, in finding that the Claimant was not disabled as of the date last insured, the ALJ explained that "[i]n comparing the claimant's [RFC] with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as actually performed." R. 34.

## II. MEDICAL EVIDENCE

Although the record is relatively sparse, it contains medical evidence of respiratory issues dating back to 2000. The record indicates that the Claimant's doctors at the University Primary Care Clinic in Rockton treated him for recurrent bouts of pneumonia and bronchitis from 2000 through 2008. R. 182, 204, 208-10, 230, 234, 236, 239-40, 243-44, 246-49, 254-59, 260-62. The Claimant reported fatigue to his doctors at the University Primary Care Clinic in Rockton in February 2000, 3 months before he retired, and fainting, dizziness, and lightheadedness in 2001. R. 230, 234. After experiencing coughing and shortness of breath, he was diagnosed with pneumonia by Dr. Clair Eliason in 2002 and bronchitis by Dr. Henley in early January 2003 without any diagnostic tests. R. 236, 239-40. Following an x-ray, Dr. Henley diagnosed Claimant with emphysema on January 30, 2003. R. 241, 278-82. The Claimant saw his doctor again in September, 2003 complaining of a cough and allergy symptoms, and the doctor again noted presence of emphysema. R. 243-44, 313.

The medical records also show that the Claimant's doctors treated him for allergic rhinitis[2] continuously since 2000. R. 182, 204, 208-10, 230, 234, 236, 239-40, 243-44, 246-49, 254-59, 260-62. The Claimant was prescribed Clarinex for approximately 11 years and Nasonex for what he presumed was allergies, but was later diagnosed as severe emphysema, severe COPD, mild obstructive sleep apnea syndrome, and restless leg syndrome with periodic limb movement disorder in 2008. R. 182, 204, 208-210, 260-62.

Specifically, in 2008, Nurse Brady sent the Claimant to Swedish American Hospital for a consultation because the Claimant was experiencing severe respiratory symptoms and his wife reported that the Claimant's emphysema had recently become more of a problem. R. 262-65.

---

[2] Allergic rhinitis is the inflammation of the nasal mucous membrane associated with hay fever. *See* Stedman's Medical Dictionary 1544 (26th ed. 1995).

4

The Claimant's physician at Swedish American Hospital, Dr. Vivak Thappa, confirmed the cause of the Claimant's exertional dyspnea[3] with a polysomnogram, a continuous positive airway pressure ("CPAP") titration study, and pulmonary function tests. R. 208-18, 299-302. In particular, the claimant's pulmonary function tests in September, 2009 showed that his forced expiratory volume in one second ("$FEV_1$")[4] was only 25 percent of predicted, indicating severe COPD without significant reversibility. R. 211. Dr. Thappa also noted that the Claimant had significant oxygen desaturation, could not walk more than 50 to 100 feet before getting out of breath, and that he had never had a pulmonary function test. R. 208-10. Dr. Thappa prescribed Advair Diskus, Spiriva, Claridin D, supplemental oxygen, and a CPAP machine to ease the Claimant's exertional dyspnea and sleep apnea. R. 164, 179, 206. According to the Claimant, Dr. Thappa suggested a lung transplant in 2008, but the Claimant declined. R. 29, 180, 200, 204. The Claimant has undergone treatment for these disorders since 2008, including taking 12 hours of supplemental oxygen per day. R. 59, 266-69, 346-415.

In 2011, Nurse Brady, the Claimant's primary treater, submitted a Medical Opinion regarding the Claimant's Ability To Do Work-Related Activities (Physical). She indicated that the Claimant was limited to standing less than 2 hours per day with changing positions every 5 minutes and sitting 2 hours per day with changing positions every 15 minutes. R. 416-17. He was required to sometimes shift at will or lie down during work. R. 417. She opined that he could not walk more than 20 to 25 minutes total per work day, and required oxygen all night and 3 hours in the afternoon. R. 417. She opined that he had no noise restrictions, but should avoid

---

[3] Exertional dyspnea is excessive shortness of breath, or a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs occurring normally after exercise. *See* Stedman's Medical Dictionary 535 (26th ed. 1995).

[4] A $FEV_1$ is the "volume of air exhaled during the first second of a forced expiratory maneuver, [used to detect] obstructive diseases since a person with obstructed airways will not be able to exhale as much air in the first second as a person with normal lungs." *See* Basic Spirometric Calculations, CTRS. FOR DISEASE CONTROL & PREVENTION, http://www.cdc.gov/niosh/docs/2004-154c/pdfs/2004-154c-ch5.pdf (last visited April 7, 2014).

all exposure to extreme heat or cold, wetness, humidity, fumes, and hazards. R. 418. She noted that his ability to speak was restricted because he became winded after speaking between 5 to 7 words, and that he was expected to miss more than 3 days of work per month. R. 418. She also submitted a letter further detailing his impairments as of 2011. R. 419. She indicated that his emphysema was fairly stable until December 2005. R. 419.

The record contained Illinois Request for Medical Advice surveys from two state agency physicians dated October 1, 2009 and February 9, 2010. R. 309-311, 314-316. The state agency physicians indicated that the medical evidence was insufficient to evaluate whether the Claimant was disabled before the date last insured. R. 309-311, 314-316.

### III. LEGAL STANDARDS

#### A. Disability Standard

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a

severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's RFC; and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

**B. Legal Standards Relating to Individuals Closely Approaching Retirement Age**

An individual closely approaching retirement age will be found disabled if he can no longer perform past relevant work and has a history of unskilled work experience, or if he has only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within his functional capacity. 20 C.F.R. § 404, Subpt. P, App. 2 § 202.00(c). "For a finding of transferability of skills to light work for individuals of advanced age who are closely approaching retirement age (age 60-64), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." 20 C.F.R. § 404, Subpt. P, App. 2 § 202.00(f). Accordingly, an individual in this age group will be found disabled if he cannot perform past relevant work and cannot make a direct entry into other work. *See Lipke v. Astrue*, 575 F. Supp. 2d 970, 983 (W.D. Wis. 2007) (individual closely approaching retirement age limited to light work is disabled unless he has acquired transferrable skills and there is very little vocational adjustment required); *Bell v. Bowen*, 658 F. Supp. 533, 539 (N.D.

Ill. 1987) ("A claimant who is 60 or older and cannot do her past relevant work is not expected to make more than a minimal adjustment to a new job…").

## C. Standard of Review

A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  Likewise, when the ALJ's decision is grounded on a mistake of fact, the court must remand. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) ("When the decision of that tribunal on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless.")

Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  Many Commissioner decisions have been reversed for failing to provide an accurate and logical bridge. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano*, 556 F.3d at 562.  These reversals have occurred despite the not-so-onerous requirements of a "logical bridge;" namely, that the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

## IV. DISCUSSION

### A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for three (3) reasons. First, the Claimant asserts that the ALJ made a critical mistake of fact regarding the nature of the Claimant's past relevant work. Dkt. #15, p. 7. Second, the Claimant argues that the ALJ improperly assumed the role of doctor because there were no contradictory medical opinions in the record to support the ALJ's finding. Dkt. #15, p. 8. Third, the Claimant argues that the ALJ improperly rejected the 2011 opinion of the Claimant's primary provider, Nurse Brady. Dkt. #15, p. 11-12.

The Commissioner unpersuasively argues that the ALJ did not err in determining that the Claimant retained the RFC to perform his past relevant work, because any minor "typographical error" made by the ALJ in relation to the number of cars moved (20 *per hour*, not *per day*) and the distance traveled per day was harmless. Dkt. #16, p. 13-14. Additionally, the Commissioner argues that the ALJ did not err because he properly weighed the medical evidence and reasonably gave little weight to Nurse Brady's 2011 opinion. Dkt. #16, p. 9-13.

As explained below, in light of the obvious mistakes in the ALJ's opinion, the Court is surprised that the Commissioner did not consent to remand this case for further consideration. Social Security appeals are a serious business. Judicial resources are scarce, and as required by Seventh Circuit precedent, this Court carefully examines the record and the ALJ's decision in all appeals. The decision regarding benefits can have life-changing effects on claimants. Just as plaintiff's counsel should discourage clients from filing meritless appeals, *see Martinez v. Colvin*, No. 12 CV 50016, 2014 WL 1305067, *9 (N.D. Ill. Mar. 28, 2014), the Commissioner should recognize when there is no legitimate basis to contest the appeal and should promptly

agree to remand such cases for further consideration.  This would conserve significant resources for the Court and the parties, and help ensure that claimants, who are often destitute and suffering from severe mental and physical impairments, receive a more prompt adjudication of their claims.

**B. Analysis**

**1. The ALJ's mischaracterization of the Claimant's past relevant work warrants remand.**

The ALJ erred by significantly mischaracterizing the Claimant's past relevant work.  The nature of the Claimant's past relevant work is critical in this case because of his age at the time last insured.  As noted above, the Claimant was an individual "closely approaching retirement age" within the regulations. 20 C.F.R. § 404, Subpt. P, App. 2 § 202.00(f).  Because of the VE's testimony that the Claimant had no transferable skills to light work, the Claimant must have been able to perform past relevant work, or he would have been found disabled.  20 C.F.R. § 404, Subpt. P, App. 2 § 202.00(c); *see also Bell*, 658 F. Supp. at  538.  To determine whether he was physically capable of returning to his former work as of the date last insured, the ALJ obviously was required to ascertain the specific demands of the Claimant's past relevant work in relation to his physical capacities. *See Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984).

The Social Security Administration ("SSA") recognizes the importance of properly characterizing a Claimant's past relevant work.  The SSA instructs that:

> Evaluation under sections 404.1520(e) and 416.920(e) of the regulations requires careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of his or her [past relevant work]  to determine whether the individual can still do that work.
> …
> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important

and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

*Titles II & XVI: A Disability Claimant's Capacity to Do Past Relevant Work, in Gen.*, 1975-1982

Soc. Sec. Rep. Serv. 809, *2 (S.S.A. 1982).

In this case, the ALJ described the Claimant's past relevant work as follows:

> The claimant has past relevant work as an automobile factory driver and inspector. He testified that this job required him to drive cars to a shipping gate and walk back to the plant. This walk was reportedly about 250 feet. The claimant explained that he usually drove about twenty cars per day, and sometimes he had to drive them further out. A letter from the claimant's employer noted that he had to walk about 400 feet every time he drove cars out to the shipping gate. In his application for benefits, the claimant noted that he had to do a lot of fast walking, and he had to walk for about four hours per day, stand and sit for about two hours per day, and lift and carry less than ten pounds.

R. 33.

It is undisputed that the Claimant worked as a driver for 33 years at the Chrysler Corporation automobile assembly plant in Belvidere, Illinois. R. 140. As a driver, he walked around each vehicle coming off of the "9190 assembly line" to inspect it, completed basic paperwork indicating whether the vehicle passed his inspection, drove each vehicle coming from inside the plant to the "ship chute" located outside of the plant, parked the vehicle, and "walked fast" back into the plant to inspect and move the next vehicle coming off of the assembly line. R. 54, 188. The Claimant moved between 20 and 30 cars from the assembly line to the ship chute *per hour*.[5] R. 54-56, 195, 189-90. He worked 8 or more hours per day and had 2 breaks per 8 or 9 hour shift. R. 195.

The critical errors in the ALJ's opinion relate the number of cars moved, and consequently the amount of walking performed by the Claimant per day, and the Claimant's

---

[5] The Claimant testified that the number of cars held steady at 20 *per hour* throughout the year. R. 54-56. Other record evidence indicated that at least as of 2005, a driver at the Belvidere plant was required to move up to 30 cars from the assembly line to the ship chute *per hour*. R. 189-90.

exposure to weather during his job. The Claimant testified and consistently claimed throughout the application process that he moved approximately 20 cars *per hour*, not per day. R. 54-56, 140, 195. However, in his opinion, the ALJ indicated that the Claimant moved 20 cars *per day*. R. 33. This mistake is obviously critical. There is a significant difference in exertional level between walking 250 to 400 feet 20 times per day versus at least 160 times per day (20 times per hour, 8 hours per day). By the Court's own calculations, the ALJ characterized the Claimant's past relevant work to include merely .95 to 1.5 miles (5,000 to 8,000 feet) of walking per day. In fact, the Claimant "walked fast" at least 7.6 to 12.1 miles (40,000 to 64,000 feet) per 8-hour workday. Additional record evidence suggests that the Claimant moved up to 30 cars *per hour*, which translates to walking between 11.4 and 18.2 miles (60,000 to 96,000 feet) per 8-hour workday. There is a substantial difference between walking fast .95 to 1.5 miles per day and 7.6 to 18.2 miles per day. The Court cannot ignore the egregiousness of this mistake, particularly in light of the seriousness of the Claimant's respiratory conditions. *See Sarchet*, 78 F.3d 305, 309 (7th Cir. 1996) (remanding for mistake of fact); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (remanding because ALJ failed to explain how he determined onset date); *Lipke*, 575 F. Supp. 2d 970, 982 (W.D. Wis. 2007) (remanding for ALJ to make new findings regarding the claimant's past relevant work); *Bell*, 658 F. Supp. 533, 538 (N.D. Ill. 1987) (awarding benefits where ALJ mischaracterized nature, including the physical demands, of the claimant's past relevant work).

Additionally, the ALJ did not discuss the effects of weather conditions on the Claimant's ability to perform his past relevant work. The Claimant testified that he had to retire, in part, because the extreme hot temperatures in the summer made it difficult for him to breath when moving cars from inside the plant to outside the plant, and walking fast back to the assembly

line.  R. 55-56, 166.  The ALJ made no mention of this aspect of the Claimant's past relevant work when determining whether he could perform it given his severe impairments of emphysema, chronic obstructive pulmonary disease ("COPD"), and sleep apnea.  On remand, the ALJ should also carefully consider this aspect of the Claimant's job when determining whether he could perform his past relevant work as of the date last insured.  *See Strittmatter*, 729 F.2d at 509; SSR 06-03p, 1975-1982 Soc. Sec. Rep. Serv. 809, *3 (Jan. 1, 1982) ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work…Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements…")

The Commissioner's brief concedes the ALJ's error regarding the number of cars moved per day, but fails to address the weather conditions issue.  The Commissioner argues that (1) the mistake was a mere typographical error, and the ALJ *clearly* meant 20 cars per hour, 8 hours per day; or, alternatively, (2) the mistake constituted harmless error.  Both arguments fail.

Specifically, the Commissioner first argues that "the ALJ's examination of [the Claimant] at the administrative hearing makes clear that the ALJ fully understood the physical demands of [the Claimant's] past work – namely driving 20 cars per hour and walking 250-400 feet back to the factory after each car."  This argument is meritless.  It is not clear to the Court that the ALJ meant 20 cars *per hour*, 8 to 9 hours per day, and that the ALJ analyzed the Claimant's ability to perform his past relevant work at that exertional level.  The ALJ, not the Court or the Commissioner, is required to build a logical bridge between the evidence and his findings by minimally articulating the reasons for his findings *in his written opinion*. *Smith v. Astrue*, 467 F.

App'x 507, 510-11 (7th Cir. 2012) ("An ALJ must explain her reasoning, building a so-called "logical bridge" that connects the evidence and her decision.")  As explained above, the nature of the Claimant's past relevant work is absolutely critical in this case and the ALJ's mistake regarding the nature of the work cannot be overlooked on the theory that it was a mere "typographical error". *See Kline ex rel. J.H.-K. v. Colvin*, No. 11 C 50376, 2014 WL 69953, *16 (N.D. Ill. Jan. 9, 2014) (ALJ's citation to wrong standard in her written opinion was reversible error even though ALJ acknowledged correct standard during hearing); *Hacker v. Astrue*, No. 408-CV-0148-DFH-WGH, 2009 WL 1797848, *5-6 (S.D. Ind. June 24, 2009) (finding ALJ's inconsistent description of limitations was reversible error).

Second, the ALJ's mistake regarding the nature of the Claimant's past relevant work would not constitute harmless error.  The Commissioner unpersuasively argues that the ALJ correctly found that the Claimant retained the RFC to perform a full range of light work, which includes jobs that require a good deal of walking.  Therefore, he could have still performed his past relevant work, walking 7.6 to 18.2 miles per day.  Although the Claimant may have been able to walk fast 7.6 to 18.1 hours per day as of the date last insured, the ALJ did not make that finding in his opinion.  In finding that the Claimant could perform his past relevant work, the ALJ merely explained, "In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as actually performed." R. 34.  Without any further explanation, it is impossible for the Court to determine whether the ALJ considered this important information when determining whether the Claimant could his perform past relevant work. *See Strittmatter*, 729 F.2d at 509 ("But from the administrative law judge's excessively brief discussion we cannot determine whether he did ascertain the demands of [the claimant's] former work and compare them with

her present physical capacity."); *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785-86 (7th Cir. 2003) ("Such a lack of reasoning prevents us from applying the decision structure undergirding disability determinations to a substantive analysis of [the claimant's] impairments."). Moreover, the Court has instructed time and time again that the Commissioner cannot make arguments for the ALJ that he failed to make in his opinion. *Smith v. Astrue*, 467 F. App'x 507, 510-11 (other evidence contained in the record that supports the finding and cited in the Commissioner's brief cannot be used now to seek affirmance on appeal). Accordingly, the decision of the Commissioner is not supported by substantial evidence.

In light of the ALJ's critical mistake of fact regarding the nature of the Claimant's past relevant work, and the ALJ's failure to consider the weather-related impact of the Claimant's prior work, the case must be remanded for further consideration of these issues.

**2. The ALJ improperly "played doctor".**

Although the ALJ's critical mistake regarding the Claimant's past relevant work is sufficient to remand the case, the Court is compelled to address the Claimant's other arguments. The Claimant next argues, and the Court agrees, that the ALJ impermissibly "played doctor" and erred by not having a medical expert testify at the hearing.

Ultimately, the Claimant's claim turns on *when* he became disabled. *See Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) ("[T]he critical date is the *onset* of disability, *not* the date of diagnosis.") (citations omitted). To determine a claimant's onset date, the ALJ must consider 1) the claimant's allegations regarding the onset, 2) the date the claimant stopped working, and 3) the medical evidence of onset. *Henderson by Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir. 1999) (citations omitted). Of the three, the medical evidence is the key factor, and the chosen onset date should be consistent with it. *Id.*

In cases where the claimant has a progressive disorder, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling and in such cases, it will be necessary to infer the onset date from the medical and other evidence." *Thomas v. Colvin*, No. 112-CV-160-JEM, 2013 WL 3337986, *7 (N.D. Ind. July 2, 2013) (citing SSR 83–20). Therefore, in cases where the ALJ must infer an onset date because of an incomplete medical history, the ALJ should consult a medical advisor. *Henderson,* 179 F.3d at 513; *Titles II & XVI: Onset of Disability*, 1983-1991 Soc. Sec. Rep. Serv. 49, *3 (S.S.A. 1983) ("At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.") However, the Court will not disturb an ALJ's finding regarding the onset date when there is substantial evidence in the record to support the date chosen by the ALJ, even if an earlier date could have been supported by the evidence. *Pesek v. Apfel*, 215 F.3d 1330 (7th Cir. 2000).

In this case, the ALJ's finding that the Claimant was not disabled as of his date last insured was not supported by substantial evidence in the record. To be sure, there are few medical records predating the date last insured that help identify the exact date that the Claimant's symptoms became disabling. However, other courts have noted that severe emphysema, and COPD diseases are progressive in nature. *See Twigg v. Apfel*, No. 99 C 5986, 2000 WL 1053964, *5 (N.D. Ill. July 31, 2000) (COPD is a progressive disease); *Gammon v. Astrue*, No. 09-03419-CV-S-DGK, 2011 WL 529811 (W.D. Mo. Feb. 7, 2011) (emphysema is a progressive disease). Accordingly, the ALJ was required to infer the onset date that the Claimant's severe impairments became disabling. *See Thomas*, 2013 WL 3337986 at *7.

The ALJ failed to support his determination that the Claimant's severe impairments were not disabling as of the date last insured with substantial evidence. At least one of the Claimant's

serious impairments, emphysema, began at least more than two years before the date last insured. As of 2008, the Claimant could not walk more than 50 to 100 feet before getting out of breath, and his job as a driver, to which the ALJ found he could have returned as of the date last insured, required him to walk between 40,000 and 96,000 feet per day. R. 208-10.   Eventually, in 2008, Dr. Thappa diagnosed as severe emphysema, severe COPD *without significant reversibility*, and mild obstructive sleep apnea syndrome. R. 182, 204, 208-210, 260-62.  As of September 2009, just 4 years shy of the date last insured, the Claimant's respiratory tests indicated that his lungs function at a mere 25 percent of predicted value for an individual his age and he had significant oxygen desaturation. R. 208-11.  By 2011, the Claimant was on 12 hours of oxygen daily. R. 57.

Based on the record evidence, the Claimant has severe impairments, but unclear when those impairments became disabling.  Accordingly, the ALJ should have obtained testimony from a medical expert. *See Smith v. Colvin*, No. 1:12-CV-00795-TWP, 2013 WL 5309807, *4-5 (S.D. Ind. Sept. 20, 2013) (remanding for failure to consider claimant's testimony regarding onset date and for failing to have medical expert testify at hearing despite sparse evidentiary record and diagnosis after the date last insured); *Thomas*, 2013 WL 3337986 at *7-8 (remanding for medical expert testimony regarding when the claimant's cancer became disabling where ALJ failed to support onset date with objective medical evidence); *Qualkenbush v. Barnhart*, No. 01 C 8648, 2003 WL 22880838, *9 (N.D. Ill. Dec. 5, 2003) (same).

Additionally, the ALJ erred by failing to cite any contrary evidence in the record to support his finding that the Claimant was not disabled as of the date last insured.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.") Indeed, the ALJ could not have cited any contrary evidence because there is none in the record.

In fact, two state agency physicians refused to give opinions regarding the date the Claimant's symptoms became disabling because of insufficient medical evidence. This is further proof that the ALJ needed testimony from a medical expert. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013) (remanding where no medical opinion from consultative physician or other medical evidence to support ALJ's findings regarding limitations).

The Commissioner argued that the ALJ properly weighed the medical evidence when reaching his finding. Specifically, the Commissioner argues that the ALJ properly relied on the *lack* of chronic respiratory complaints during the relevant period and inconsistencies in the Claimant's testimony regarding his limitations[6] to support his finding that the Claimant was not disabled. R. 33. However, the Seventh Circuit has instructed that ALJ's must tread carefully when relying on the lack of medical records to support their findings. *See Lichter*, 814 F.2d at 435. An ALJ must not draw any inferences about a claimant's condition from his failure or infrequency of treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)

Importantly for this case, the Court notes evidence that would help explain why the Claimant did not pursue aggressive treatment before the date last insured. Namely, the Claimant testified that he retired in 2000 because of breathing difficulties that he erroneously attributed to allergies. R. 57. He did not pursue more aggressive treatment because he believed for years that his severe respiratory symptoms were allergy-related. R. 57, 63. Indeed, the medical records show that his doctors treated him for allergic rhinitis with prescription medication since 2000. R. 182, 204, 208-10, 230, 234, 236, 239-40, 243-44, 246-49, 254-59, 260-62. Additionally, the medical records show that he complained of respiratory issues, and his doctors treated him for

---

[6] The Court will not address the ALJ's credibility analysis because the Claimant has not raised the issue on appeal. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (arguments not raised are forfeited on appeal).

recurrent bouts of pneumonia and bronchitis, from 2000 through 2008. R. 182, 204, 208-10, 230, 234, 236, 239-40, 243-44, 246-49, 254-59, 260-62. The Claimant and his wife indicated that they were not informed of his emphysema diagnosis in January, 2003 and the confirmation of that diagnosis in September, 2003 until Nurse Brady referred him to Dr. Thappa for a consult in 2008. R. 195, 241, 243-44, 278-82, 313. The ALJ erred by failing to consider these other possible explanations for the lack of treatment. See *Pierce*, 907 F. Supp. 2d at 951 (failure to consider reasons for limited treatment when inferring onset date warranted remand).

Ultimately, the ALJ alone cannot determine the onset date of the Claimant's disability and whether he was disabled as of the date last insured. On remand, the ALJ is directed to obtain a medical expert to testify regarding the course of Claimant's severe respiratory impairments and when his symptoms became disabling.

**3. The ALJ improperly rejected Nurse Brady's 2011 Opinion.**

Finally, the Claimant argues that the ALJ improperly rejected Nurse Brady's 2011 opinion regarding the severity of the Claimant's condition. The Claimant concedes that her report cannot be used to establish the existence of a medically determinable impairment. Dkt. #15, 11-12; see also *Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) (a nurse-practitioner is not a medically acceptable source). Instead, citing to SSR 06-03p, the Claimant argues that Nurse Brady's opinion is "important and should be evaluated on key issues such as impairments, severity, and functional effects along with other relevant evidence." Dkt. #15, 11-12. The Claimant points out that Nurse Brady had a 10-year treatment relationship with the Claimant, treated the Claimant before the expiration of his insured period, and noted Claimant's breathing difficulties in her treatment notes. Dkt. #15, 11-12.

Social Security Ruling 06–3p provides that opinions from sources that are not medically acceptable should not be rejected, but rather they "are important and should be evaluated on key issues such as impairments severity and functional effects, along with the other relevant evidence in the file." *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1038 (N.D. Ind. 2010) (citing SSR 06–3p). SSR 06-3p requires that the ALJ apply the factors set forth in 20 C.F.R. § 404.1527(d) when considering these opinions, including the length, nature, and frequency of treatment, the consistency of the opinion with other evidence, how well the source explains the opinion, and the source's expertise.  SSR 06-03p, 71 FR 45593-03; 20 C.F.R. § 404.1527(d).

The ALJ failed to apply the SSR 06-3p factors when discounting Nurse Brady's opinion. The ALJ only identified one inconsistency between Nurse Brady's 2011 opinion and the medical records before the date last insured, namely that the Claimant had very few complaints of respiratory symptoms. R. 33.  The ALJ erred by failing to discuss the length and nature of Nurse Brady's treatment of the Claimant, or that Nurse Brady treated the Claimant multiple times, including before the date last insured. *Dogan*, 751 F. Supp. 2d at 1038-40 (remanding for failure to examine SSR 06-3p factors when rejecting treating nurse-practitioner's opinion). Additionally, the ALJ erred by discounting Nurse Brady's opinion because of alleged inconsistencies without detailing what inconsistencies existed in the record.  *See id*.  The ALJ has a duty to build a logical bridge between the evidence and his findings, and failed to do so here. *Berger*, 516 F.3d at 544.

The Commissioner responded that the ALJ properly rejected Nurse Brady's opinion because 1) she expressed an opinion as to Claimant's functional capacity as of 2011, six years after the date last insured, and 2) it was inconsistent with her treatment records and other substantial evidence in the record before the date last insured. Dkt. #16, 12-13.

The Commissioner's first argument fails. In her 2011 Ability To Do Work-Related Activities and letter, Nurse Brady opined that due to Claimant's emphysema, physical work *is* difficult as it increases his work of breathing leading to shortness of breath and increased oxygen needs. R. 416-19. (emphasis added). The Commissioner is correct that the ALJ would have properly declined to give Nurse Brady's 2011 opinion any weight because it discussed Claimant's ability to work as of 2011, more than 6 years after the date last insured. *See Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987) (the opinions of treating physicians that the claimant was disabled after the date last insured were not relevant to her physical condition before the expiration of her insured status); *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008) (medical evidence from after the date last insured is not relevant to the determination of disability benefits). However, the ALJ made no such finding, and the Commissioner cannot make the argument for the ALJ on appeal. *Smith*, 467 F. App'x at 510-11.

Likewise, the Commissioner's second argument is not persuasive. In his opinion, the ALJ only identified one inconsistency between Nurse Brady's 2011 opinion and the medical records prior to the date last insured, namely that the Claimant had very few complaints of respiratory symptoms. R. 33. As explained above, the ALJ erred by failing to examine alternative causes of the Claimant's lack of treatment. Additionally, the ALJ erred by discounting Nurse Brady's opinion because of alleged inconsistencies without detailing what inconsistencies existed in the record. *See Christel v. Astrue*, No. 09-C-36, 2009 WL 2240327, *6 (E.D. Wis. July 24, 2009) (remanding for failure to cite contrary medical evidence and for relying on claimant's limited treatment without considering any explanations for such). The ALJ has a duty to build a logical bridge between the evidence and his findings, and failed to do so here. *Berger*, 516 F.3d at 544.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment is granted in part and denied in part, and this case is remanded to the SSA for further proceedings consistent with the Memorandum Opinion and Order.

It is so ordered.

Entered: April 9, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**